NOT DESIGNATED FOR PUBLICATION

No. 120,464

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DOMINIC O'SHEA HOLDER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed October 16, 2020. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., BUSER and POWELL, JJ.

PER CURIAM: Dominic O'Shea Holder appeals his conviction of possession of marijuana with intent to distribute more than 450 grams and conviction of conspiracy to distribute marijuana. Holder claims: (1) the rebuttable presumption of intent in the distribution statute is facially unconstitutional; (2) the jury instruction given on possession of marijuana with intent to distribute did not accurately state the law; (3) there was insufficient evidence to support his conspiracy conviction; (4) there was insufficient evidence to support his possession of marijuana with intent to distribute conviction; (5) the district court abused its discretion by limiting his questioning during voir dire; (6) the

1

prosecutor committed prosecutorial error in closing argument; and (7) cumulative error denied him a fair trial. Finding no reversible error, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2017, Holder, then 23, and Alyssa Holler, then 31, both lived in Arizona. Holler was working for Walmart and Holder was working for Coca-Cola, stocking the shelves of Holler's Walmart with product. They met at Walmart and struck up a friendship, although they did not identify themselves as boyfriend and girlfriend.

According to Holler's trial testimony, in March 2017, Holder started talking about an idea about delivering marijuana from Arizona to Indiana. The two discussed whether it would be safer to mail the marijuana or drive it. Holler said she thought it would be safer to drive it. Holder came up with a plan to drive marijuana from Arizona to Indiana in a rental car in Holler's name. The plan was to drive to Indiana in separate cars and then, after the delivery, Holler would ride back to Arizona in Holder's car. Holler got a new driver's license a few days before they left because Enterprise, the car rental business, required the renter's driver's license to have a current address.

On April 14, 2017, Holler rented the car with $600 Holder put on her credit card. She and Holder went to her apartment and loaded boxes into the rental car. Holder put downtown Indianapolis in Holler's GPS but did not put in a specific address. They left Arizona around 5 p.m. and stayed in contact through phone calls and text messages. During the drive, they pulled over in New Mexico to rest in their cars for a few hours.

Hutchinson Police Officer Jake Graber was driving west on Highway 50 around 2:50 p.m. on April 15, 2017, when he observed two cars speeding. One car was going 89 miles per hour (mph) and the other was going 92 mph. Graber pursued the cars, intending to pull them both over. He caught up to the first vehicle, a white car driven by a female,

2

and motioned her to pull over. But the female did not stop. He did successfully pull over the second vehicle, a blue car driven by a male. Graber put a description of the white car out on the radio, stating that it was speeding and did not stop.

Holder, the driver of the blue car, gave Graber an Arizona driver's license and stated he was traveling to Chicago. Holder told Graber that he was from Tempe, Arizona, and left there around 6 p.m. the previous evening. Graber asked Holder about the white car, but Holder stated he did not know the other driver and they were not traveling together. During the stop, Graber noticed Holder's eyes were "extremely bloodshot." Graber asked about Holder's eyes and Holder stated he smoked marijuana before he left. Graber conducted field sobriety tests, which Holder passed.

Meanwhile, Reno County Sheriff's Deputy John Hendricks heard Graber's radio description of the white car that did not stop. Hendricks found the car making a U-turn about 3 miles east of where Graber stopped Holder. Hendricks followed the car, which was headed back towards Graber, and so did Reno County Sheriff's Deputy Jack Trussell. Trussell pulled the car over and Hendricks assisted. Trussell talked to the driver, Holler, and asked for her driver's license. Holler gave Trussell a paper license issued April 13, 2017. After hearing that Trussell had stopped the white car, Graber gave Holder a citation for speeding and headed to Trussell's traffic stop. Holder apparently returned to Arizona.

When Graber arrived at the other stop, Trussell identified Holler as the driver and stated she was from Arizona. Graber went to talk with Holler and noticed her driver's license was a temporary one issued two days before. Graber noticed Holler's hands were shaking throughout the stop. Holler told Graber she was headed to Indianapolis and that she left Arizona the day before. Graber asked Holler if she was traveling with Holder, but Holler denied knowing Holder. Graber learned the car was rented from Enterprise in Mesa, Arizona, and scheduled to be returned in Indianapolis. When asked, Holler could not give Graber the address of the place she was traveling to in Indianapolis. Holler also

3

told Graber she would probably head back to Arizona on Monday by airplane but that she had not bought an airline ticket yet. Graber issued her a citation for speeding and asked her if she would consent to a search of her car. Holler gave him consent.

In the backseat of the car, Graber saw a suitcase and several boxes. On one of the boxes, for a ceiling fan, Graber noticed the tape looked like it had been opened. Upon opening the box, Graber noticed the strong smell of perfume, which, from his training, is a common technique used to mask the smell of drugs. Graber saw some fan parts but not enough, so he removed the parts and found a square item about a foot and a half long wrapped in green saran wrap. Graber cut into it and found "green vegetation" and detected the odor of marijuana. Graber had Holler detained and continued his search. In the hatchback area, Graber found a Craftsman box which was heavier than the vacuum it was purported to be carrying. Graber opened the box and found eight "odd-shape[d]" items wrapped in green saran wrap. Graber placed the evidence in Trussell's patrol car.

After arresting Holler, Graber read her *Miranda* rights and then talked to her about helping herself out in this case. But Graber made no promises to Holler that she would receive leniency if she cooperated. Graber also interviewed Holler at the detention center after the stop. Graber inventoried Holler's purse and found $921. Graber also seized her cellphone. Graber stated that he knew the guy she was traveling with had been calling her since he had stopped her. Holler said his name was Dominic and that he gave her the money. Holler told Graber the plan was for her to drive back in Holder's car.

The packages from Holler's vehicle weighed 44 pounds. Graber took two of the packages that weighed more than 450 grams and sent them to the Kansas Bureau of Investigation (KBI) for testing. He believed the packages were marijuana, and the amount suggested it was for distribution. Graber did not find any use paraphernalia in the car.

4

On July 18, 2017, the State charged Holder with possession of marijuana with intent to distribute at least 450 grams and conspiracy to distribute at least 450 grams of marijuana. Holder was arrested in Arizona and transported to Kansas. The State charged Holler with possession of marijuana with intent to distribute. Holler later pled guilty and, in exchange for testifying against Holder, the State promised not to oppose probation.

The district court held Holder's jury trial in September 2018. Graber testified that based on his training and experience the items seized were marijuana. The State admitted some text messages and two photos of Holder recovered from Holler's phone. Hendricks testified to helping stop Holler and detaining her after Graber found the marijuana. Trussell testified to stopping Holler. Trussell recalled noticing a blue lunch cooler in the front seat with various food wrappers and water bottles, which based on his training could suggest drug smuggling or criminal interdiction. Trussell also explained that drug smugglers commonly use two vehicles: one vehicle being the "load vehicle" and the other being the "enforcer" or "watch-out" vehicle used to distract the police.

KBI Forensic Drug Chemist Cynthia Wood testified that her job is to determine whether evidence contains controlled substances. She was qualified as an expert in the identification of controlled substances without objection. Wood testified that marijuana is a controlled substance. Wood received two bags of vegetation for testing, both of which tested positive for marijuana based on the presence of tetrahydrocannabinol (THC). Wood weighed each bag; one weighed 159.24 grams and the other weighed 441.72 grams.

Holler testified for the State. She identified Holder and explained how they met. Holler testified that she and Holder would text back and forth, and Holder had two phones. Holler reviewed the text messages and affirmed that she either sent them or received them. Holler identified the two photos from her phone as depicting Holder.

5

Holler testified that Holder told her they would be transporting marijuana, so she knew what they were doing. Holler said she was not getting paid to help him but she did it because she cared about him. She recalled seeing the officer pull Holder over. She said she drove for about 10 miles then pulled over to wait for Holder but it took a "really long time" so she turned around to find him. She then recalled being pulled over. She testified that Holder called when she was first pulled over and told her not to say anything.

Holler admitted that she had possession of marijuana and intended to deliver it. Holler affirmed that she signed an affidavit that stated she knew there was marijuana in the car but not how much. Holler also stated in the affidavit that she and Holder discussed the trip from Arizona to Indiana but never discussed a conspiracy to distribute such a large amount of marijuana. After the State rested, Holder moved for a directed verdict, arguing there was no evidence of conspiracy because Holler stated she did not participate in a conspiracy. The district court denied Holder's motion.

After hearing the evidence, the jury found Holder guilty of possession of marijuana and conspiracy to distribute marijuana. On November 2, 2018, the district court sentenced Holder to 98 months' imprisonment with 36 months' postrelease supervision. Holder timely appealed his convictions.

ANALYSIS

*Is K.S.A. 2019 Supp. 21-5705(e)'s rebuttable presumption of intent facially unconstitutional?*

Holder first claims that K.S.A. 2019 Supp. 21-5705(e) is facially unconstitutional because it includes a mandatory rebuttable presumption of intent. Although Holder did not challenge the constitutionality of the statute in district court, he correctly argues this court can hear this issue because it involves only a question of law arising on proved facts

6

and is determinative of the matter. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Holder was convicted of possession of marijuana with intent to distribute under K.S.A. 2019 Supp. 21-5705. K.S.A. 2019 Supp. 21-5705(e)(1) states: "In any prosecution under this section, there shall be a rebuttable presumption of an intent to distribute if any person possesses . . . 450 grams or more of marijuana."

Holder argues the presumption in K.S.A. 2019 Supp. 21-5705(e) is facially unconstitutional because it violates a defendant's due process right to have every element proven to a jury beyond a reasonable doubt. Holder cites *Francis v. Franklin*, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985), *holding modified by Boyde v. California*, 494 U.S. 370, 378-79, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), for its discussion of the constitutionality of presumptions. He argues that based on the rules in *Francis*, K.S.A. 2019 Supp. 21-5705(e) creates an unconstitutional mandatory presumption because the statute uses the word "shall." Holder reiterates in his reply brief that he is arguing "K.S.A. 21-5705(e), apart from any related instruction, is facially unconstitutional."

The State argues that the presumption was conveyed to the jury by instruction and there is nothing in the statute or the corresponding jury instruction that requires the jury to assume intent. The State argues that any error was harmless under the constitutional harmless error standard. Deciding the constitutionality of a statute is a question of law subject to unlimited review. *State v. Dull*, 302 Kan. 32, 40, 351 P.3d 641 (2015).

Holder is correct that the Fourteenth Amendment to the United States Constitution requires every fact necessary to constitute a crime be proven beyond a reasonable doubt. See *Francis*, 471 U.S. at 313. But Holder fails to recognize that he cannot advance a facial challenge to the statutory presumption without first showing that the related jury instruction issued a mandatory presumption.

7

In *County Court of Ulster County, New York v. Allen*, 442 U.S. 140, 160-63, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979), the United States Supreme Court found that a facial challenge to a statutory presumption is improper without first examining the presumption as applied and determining that the presumption issued was mandatory. *Allen* examined a New York state statute that provided that the presence of a firearm in a car is presumptive evidence of illegal possession by all occupants. The United States Supreme Court first explained that

> "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations." 442 U.S. at 154-55.

The Court then stated that to determine whether a petitioner has standing to advance a facial challenge to a statutory presumption depends on the type of presumption involved in the case. 442 U.S. at 156. After discussing the difference between mandatory and permissive presumptions, the United States Supreme Court stated that the Court of Appeals for the Second Circuit erred because it never discussed the jury instructions given in the case and "[w]ithout determining whether the presumption in this case was mandatory, the Court of Appeals analyzed it on its face as if it were." 442 U.S. at 160.

As explained in footnote No. 16 of *Allen*, "[i]n deciding what type of inference or presumption is involved in a case, the jury instructions will generally be controlling, although their interpretation may require recourse to the statute involved and the cases decided under it." 442 U.S. at 157, n.16. The Court then examined the jury instructions issued in *Allen* and found they gave a permissive presumption, not a mandatory one. 442 U.S. at 161. The Court found that "[o]ur cases considering the validity of permissive statutory presumptions such as the one involved here have rested on an evaluation of the

presumption as applied to the record before the Court. None suggests that a court should pass on the constitutionality of this kind of statute 'on its face.'" 442 U.S. at 162-63.

Contrary to Holder's assertion, this court should not examine the statute apart from any related jury instruction. A defendant only has standing to advance a facial challenge to a statutory presumption when the jury instructions in the case issued a mandatory presumption. In fact, all the authority Holder cites examines the presumption as issued in the jury instruction, not the presumption as enumerated in the statute. See *Yates v. Aiken*, 484 U.S. 211, 214, 108 S. Ct. 534, 98 L. Ed. 2d 546 (1988) (stating the Fourteenth Amendment "'prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime'"); *State v. Harkness*, 252 Kan. 510, 524-27, 847 P.2d 1191 (1993) (addressing appellant's challenge to jury instruction on intent). And in *Francis*, which Holder relies on, the United States Supreme Court laid out the proper analysis to determine whether the presumption described *in the jury instruction* is a mandatory presumption or a permissive presumption. 471 U.S. at 313-14.

Thus, the proper analysis begins with identifying the presumption as issued in the jury instruction. *Francis* explained: "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." 471 U.S. at 314. Here, the jury instruction stated, in relevant part:

> "If you find the defendant possessed 450 grams or more of marijuana, you may infer that the defendant possessed with the intent to distribute. You may consider this inference along with all the other evidence in the case. You may accept or reject it in determining whether the State has met the burden of proving the intent of the defendant. The burden never shifts to the defendant."

9

From its language, it is clear that the presumption issued in the jury instruction is permissive, suggesting a possible conclusion but not requiring the jury to draw that conclusion. Holder even concedes that the jury instruction issued a permissive presumption. Thus, in accordance with *Allen*, Holder lacks standing to advance a facial challenge to the statute. See 442 U.S. at 163.

The only argument Holder has standing to advance is a due process challenge to the validity of the permissive presumption as applied to the record in his case. See 442 U.S. at 162-63. But Holder does not advance any argument that the permissive inference issued violated his due process rights in this case. His entire argument on this issue rests on a facial challenge to the statute. Based on *Allen*, we conclude that Holder lacks standing to challenge the constitutionality of the rebuttable presumption of intent found in K.S.A. 2019 Supp. 21-5705(e)(1).

*Was the district court's instruction on the presumption of intent to distribute legally inappropriate?*

Holder argues in the alternative that if this court finds K.S.A. 2019 Supp. 21-5705(e) to be constitutional, then the jury instruction given is still erroneous because it does not accurately reflect the law. Holder concedes he did not object to the instruction based on this issue at trial but correctly argues he can raise it for the first time on appeal. See K.S.A. 2019 Supp. 22-3414(3) (stating a party can raise a jury instruction error even if the party did not object below if the instruction was clearly erroneous).

This court employs a multi-step process to review claims of jury instruction error. First, this court must decide whether the issue was preserved. Second, it must decide whether an error occurred by determining whether the instruction was legally and factually appropriate. In addressing the first two steps, this court exercises unlimited review. *State v. Williams*, 308 Kan. 1439, 1451, 430 P.3d 448 (2018).

10

If error is found, this court must then determine whether the error warrants reversal. 308 Kan. at 1451. Because Holder did not object at trial, a clear error standard applies. See K.S.A. 2019 Supp. 22-3414(3); 308 Kan. at 1451. Under a clear error standard, the appellate court must decide "whether it is 'firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" 308 Kan. at 1451. Holder has the burden of establishing clear error. See *State v. Gentry*, 310 Kan. 715, 721, 449 P.3d 429 (2019).

Holder argues the instruction was not legally appropriate because it does not accurately state the presumption contained in the statute. He then moves on to the clear error and reversibility arguments. The State counters that the instruction was legally appropriate and conformed to the pattern instruction and the evidence at trial.

An instruction must fairly and accurately state the applicable law to be legally appropriate. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). Here, the jury instruction gave the elements of possession of marijuana with intent to distribute, defined some of the terms, and then, as we have earlier discussed, included the following language on a presumption of intent to distribute:

> "If you find the defendant possessed 450 grams or more of marijuana, you may infer that the defendant possessed with the intent to distribute. You may consider this inference along with all the other evidence in the case. You may accept or reject it in determining whether the State has met the burden of proving the intent of the defendant. The burden never shifts to the defendant."

As the State points out, this language conforms to the instruction required under PIK Crim. 4th 57.020 (2014 Supp.). The PIK instruction's Notes on Use references K.S.A. 21-5705(e)(1) as authority for this language. As we earlier discussed, K.S.A. 2019 Supp. 21-5705(e)(1) states: "In any prosecution under this section, there shall be a

rebuttable presumption of an intent to distribute if any person possesses . . . 450 grams or more of marijuana."

Holder conclusively states in one paragraph of his brief that the instruction is legally inappropriate:

> "The instruction issues a permissive mandate, as opposed [to] the restrictive mandate of the statute. Upon a showing of the predicate facts, the instruction states that the burden never shifts to the defendant, whereas the statute indicates that the burden does shift to the defendant. And most of all, the middle two sentences of the instruction are found nowhere in the statute. Given all of this, it cannot be said that the challenged instruction fairly and accurately reflects K.S.A. 21-5705(e), resulting in a legally inappropriate instruction being given to the jury, as no other law authorizes this instruction."

Holder provides no authority or analysis for how the language in the statute establishes a "restrictive mandate" or how the burden shifts to the defendant. Assuming he is advancing the same argument as in his first issue, Holder's argument hinges on the statute's use of the word "shall" to establish that the statute prescribes a mandatory presumption of intent to distribute. But his argument fails to acknowledge that the word "shall" does not always reflect a mandatory directive. See, e.g., *State v. Johnson*, 286 Kan. 824, 850, 190 P.3d 207 (2008) (discussing that the context of the statutory scheme and caselaw may render the word "shall" directory and not mandatory). Holder does not go through any of the analysis required to determine whether the Legislature's use of the word "shall" was mandatory or directory. See, e.g., *State v. Holt*, 298 Kan. 469, 474, 313 P.3d 826 (2013) (stating there are four factors to consider in determining whether the Legislature's use of "shall" makes a statutory provision mandatory or directory).

Contrary to Holder's argument, we find that from a plain reading of the statute, the use of the word "shall" refers to the existence of the presumption and not a mandate on

12

how the presumption should be applied or used in every case. Thus, it is legally appropriate to instruct the jury that *if* it finds the defendant possessed 450 grams or more of marijuana, the jury "may infer that the defendant possessed with the intent to distribute." The instruction requires the State to prove every element of the crime including the intent to distribute. See K.S.A. 2019 Supp. 21-5108(a) ("In all criminal proceedings, the state has the burden to prove beyond a reasonable doubt that a defendant is guilty of a crime. This standard requires the prosecution to prove beyond a reasonable doubt each required element of a crime.").

In sum, Holder fails to convince us that the statute should be interpreted differently than the instruction. Thus, we reject Holder's argument that the instruction does not accurately reflect the law. We find the instruction was legally appropriate and the district court did not err by giving the instruction in Holder's case. Finding no legal error, we need not analyze the remaining steps for a jury instruction challenge.

*Was there sufficient evidence to support Holder's conviction of conspiracy?*

Holder next claims there was insufficient evidence to support his conviction of conspiracy because the State presented no evidence that his coconspirator, Holler, agreed to possess at least 450 grams of marijuana. The State argues Holder was the one who masterminded the operation and he was the one who knew how much marijuana was being transported, which is enough to support his conviction. Alternatively, the State argues that if we agree that Holler had to know the specific weight of marijuana being transported, then the remedy is to resentence Holder to a lesser offense of conspiracy.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v.*

13

*Fitzgerald*, 308 Kan. 659, 666, 423 P.3d 497 (2018) (quoting *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 [2014]).

K.S.A. 2019 Supp. 21-5302(a) defines the crime of conspiracy as "an agreement with another person to commit a crime or to assist in committing a crime." Thus, the crime of conspiracy consists of two elements: "'(1) An agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy.'" *State v. King*, 308 Kan. 16, 28, 417 P.3d 1073 (2018). Holder does not challenge the second element, that an overt act was committed. Instead, he argues that there was insufficient evidence to show that there was an agreement between him and Holler because Holler did not agree to distribute more than 450 grams of marijuana. Holder is correct that Holler testified that she never knew how much marijuana they had in the rental car.

In support of his argument that Holler had to know that more than 450 grams of marijuana was being transported for his conspiracy charge to stand, Holder cites *Ocasio v. United States*, 578 U.S. ___, 136 S. Ct. 1423, 1429, 194 L. Ed. 2d 520 (2016), for its statement that a "conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'" But *Ocasio* is interpreting the federal conspiracy statute. 136 S. Ct. at 1429 (interpreting 18 U.S.C. § 371). And *Ocasio* goes on to state: "Although conspirators must 'pursue the same criminal objective,' 'a conspirator [need] not agree to commit or facilitate each and every part of the substantive offense.'" 136 S. Ct. at 1429. Thus, *Ocasio* is unpersuasive as it discusses federal law and it undermines Holder's argument that a coconspirator must agree to every element of the criminal offense to support a conspiracy charge.

Kansas law does not require the State to prove anything other than a tacit agreement: "'[I]t is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances.'"

14

*King*, 308 Kan. at 29. "[T]he State must establish that the conspirators had a mutual understanding or tacit agreement—a meeting of the minds—or the accomplishment of a common purpose. This meeting of the minds may be expressed or implied from the acts of the parties." *State v. Smith*, 268 Kan. 222, 228, 993 P.2d 1213 (1999).

Thus, Kansas law requires only that the coconspirators agree to an unlawful purpose or to the accomplishment of a common purpose. The unlawful purpose or common goal here would be possession of marijuana with the intent to distribute. Holler knew they were transporting marijuana with the intent to distribute it, so there was sufficient evidence that Holder and Holler had a tacit agreement to accomplish an unlawful purpose, as required to support a conspiracy charge.

Even assuming Holler had to agree to every element of the underlying offense, there would be sufficient evidence to support Holder's conviction. The elements of possession of marijuana with the intent to distribute required the State to prove: (1) the defendant possessed marijuana with the intent to distribute; and (2) the quantity of marijuana possessed with the intent to distribute was at least 450 grams but less than 30 kilograms. See K.S.A. 2019 Supp. 21-5705(d)(2)(C), (e)(1). This crime does not require the possessor to *know* the quantity possessed, it simply requires the quantity to be at least 450 grams but less than 30 kilograms. This interpretation is bolstered by K.S.A. 2019 Supp. 21-5705(f)(2), which states it is not a defense to the offense that the defendant "did not know the quantity of the controlled substance or controlled substance analog."

In sum, there was sufficient evidence to support Holder's conspiracy conviction. Holler agreed to the unlawful purpose or common goal of possession of marijuana with the intent to distribute, which is enough to support a conspiracy charge. Even assuming she had to agree to each element of the underlying offense, lack of knowledge of the quantity of marijuana does not prevent the underlying offense from being completed. Thus, there is sufficient evidence to support Holder's conspiracy conviction.

15

*Was there sufficient evidence to support Holder's conviction of possession of marijuana with intent to distribute?*

Next, Holder claims there was insufficient evidence to support his distribution conviction because there was no evidence that the marijuana at issue derived from a cannabis plant. Holder argues that the statutory definition of marijuana requires the State to show that the marijuana was part of the cannabis plant, but the testimony at trial only showed that the presence of THC confirmed the substance at issue was marijuana.

The State argues there was sufficient evidence to support Holder's conviction. The State contends it only had to prove the defendant possessed marijuana, not that the marijuana derived from a cannabis plant. The State also argues that it presented expert testimony that the substance involved here was marijuana. We set forth our standard of review for a challenge to the sufficiency of the evidence in addressing the previous issue in this opinion. See *Fitzgerald*, 308 Kan. at 666.

To begin with, Holder cites the 2017 supplement's definition of marijuana. But the applicable version in effect in April 2017, when Holder committed his crimes, was the definition in K.S.A. 2016 Supp. 21-5701(j). It reads:

> "'Marijuana' means all parts of all varieties of the plant Cannabis whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufacture, salt, derivative, mixture or preparation of the plant, its seeds or resin. 'Marijuana' does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake or the sterilized seed of the plant which is incapable of germination."

Based on this definition, Holder argues: "No evidence lends any support that *the marijuana* in this case was part of any variety of the Cannabis plant." (Emphasis added.)

16

But Holder's argument confuses the issue. By definition, if a substance is marijuana, then it derives from the cannabis plant. If the substance were, for instance, part of "the mature stalks of the plant" it is, by definition, not marijuana. Thus, the evidence establishing that the substance at issue was marijuana inherently established that the substance derived from the cannabis plant; if the substance did not derive from the cannabis plant, it would not be marijuana under Kansas law.

Holder's argument is more of an evidentiary challenge, i.e., that there was not a sufficient foundation to establish that what the witnesses opined was marijuana was in fact marijuana. Our Supreme Court recently addressed a similar issue in *State v. Brazzle*, 311 Kan. ___, 466 P.3d 1195 (2020). In that case, the only evidence that Brazzle possessed oxycodone was an officer's testimony that he believed the pills found were oxycodone based on his comparison of the pills' appearance to an image of oxycodone pills on "drugs.com." 466 P.3d at 1204. Brazzle argued that the testimony could not establish that the pills were oxycodone. The court found that these types of questions "go to the foundation of the evidence and the weight of [the officer]'s testimony that the pills were oxycodone." 466 P.3d at 1206. The court pointed out that the district court admitted the testimony without objection and had Brazzle wanted to challenge the officer's conclusion and qualifications to make such conclusions, then he should have objected on foundation grounds to preserve his argument. 466 P.3d at 1206. The court found that "Brazzle has tried to recast an evidentiary ruling as a sufficiency argument" and found the officer's testimony was sufficient evidence to support the conviction. 466 P.3d at 1207.

Similarly, Holder challenges the witness' opinion that the substance the other witnesses identified as marijuana was in fact marijuana. He argues now that no evidence showed that the substance here derived from a cannabis plant. But such a challenge is really to the foundation of each witness' opinion rather than to the sufficiency of the evidence supporting the conviction.

The State charged Holder with possession of marijuana with intent to distribute in violation of K.S.A. 2019 Supp. 21-5705(a)(4), which states: "It shall be unlawful for any person to distribute or possess with intent to distribute any of the following controlled substances or controlled substance analogs thereof: [including] any hallucinogenic drug designated in subsection (d) of K.S.A. 65-4105." K.S.A. 2019 Supp. 65-4105(d)(17) states, "Marijuana." Thus, all the State needed to prove was that Holder possessed "marijuana." The State accomplished this task through the testimony of Wood, Holler, and Garber.

Wood was qualified as an expert and offered her opinion that the substance was marijuana, and she submitted a lab report stating the substance was verified as marijuana by a chemical test. Holder did not object to Wood's qualifications as an expert on the identification of controlled substances or to her opinion that the substance was marijuana. Wood also testified that there is no THC in seeds or stems and here she detected the presence of THC in the samples submitted and the samples submitted appeared to be leafy vegetation. Holler testified that she and Holder agreed to transport marijuana. Garber testified that when he found the bundles, he identified them as containing marijuana based on the appearance and smell. Because Holder did not object to any of the witness' testimony that the substance was marijuana or further inquire on what they meant by marijuana, he cannot now challenge their conclusions.

In sum, just because the definition of marijuana at K.S.A. 2016 Supp. 21-5701(j) refers to the cannabis plant does not mean the State needed to establish with any direct testimony that the substance Holder was charged with possessing came from the cannabis plant. The State needed to prove that Holder possessed "marijuana" with the intent to distribute, and three witnesses testified without objection that the substance here was marijuana. Reviewing the evidence in the light most favorable to the State, we conclude there was sufficient evidence to support Holder's conviction of possession of marijuana with intent to distribute.

*Did the district court abuse its discretion by refusing to allow Holder to ask a specific question about accomplice witnesses during voir dire?*

Holder next claims the district court erred when it prevented him from questioning the jury panel during voir dire about the credibility of accomplice witnesses. During voir dire, Holder's counsel spoke about how weighing credibility is one of the jury's jobs and then stated Holler was a cooperating witness and asked a potential juror what that meant and whether he would want to know what agreement the witness made with the State. The State asked to approach the bench and the court held a bench conference, but the record does not reflect what occurred at the bench conference. Holder then returned to general questions about credibility and examining witness' motives.

After a jury was selected, the district court let the jury break for lunch and the attorneys took up the issue of Holder's cooperating witness line of questioning advanced during voir dire. Holder's counsel stated that because the State's case relied on testimony from a cooperating witness, he should have been able to question the potential jurors about their opinions on the credibility of an accomplice. More specifically, Holder wanted to ask the potential jurors, on a scale of 1 to 10, how credible a person would be who is receiving a benefit from the State. The State explained that it objected because the line of questioning was essentially trying to get the jury to determine credibility before the witness even testified. The district court agreed with the State that the question was too close to argument and too far from determining who would be fair and impartial.

Holder now argues the district court erred in preventing him from asking his question because he had a right to know whether potential jurors would disobey the accomplice witness instruction that jurors "should consider with caution the testimony of an accomplice." See PIK Crim. 4th 51.090 (2014 Supp.). Holder argues this restraint prejudiced his right to a fair trial because the entire trial hinged on Holler's testimony.

19

The State argues the district court did not abuse its discretion in denying this line of questioning because Holder's question impermissibly asked the jury to evaluate Holler's credibility before she even testified and to base its credibility determination solely on the fact that she cooperated with the State. The State also argues Holder failed to establish prejudice resulting from the district court's ruling because he had a chance to cross-examine Holler, to attack her credibility, and to present argument on her credibility.

Voir dire is used to "'enable the parties to select jurors who are competent and without bias, prejudice, or partiality.'" *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015). "The court may limit the examination by the defendant, the defendant's attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose." K.S.A. 2019 Supp. 22-3408(3). The district court has broad discretion in controlling voir dire. *State v. Hudgins*, 301 Kan. 629, 634, 346 P.3d 1062 (2015). "Deference to the trial court's discretion is the hallmark of voir dire issues in criminal appeals." 301 Kan. at 634. A defendant challenging the scope of voir dire must show (1) the district abused its discretion in limiting the scope of voir dire and (2) the limitation prejudiced the defendant. See 301 Kan. at 634-35.

Holder must first show the district court imposed an unreasonable limitation on voir dire by preventing him from asking potential jurors to quantify the credibility of a cooperating witness. He cannot meet his burden on this point. Asking potential jurors to quantify, on a scale of 1 to 10, the credibility of Holler or a cooperating witness does not help determine whether a juror is fair or impartial. Instead, Holder's question seemed to be an impermissible attempt to "stake" out the jurors on how they would judge Holler's testimony. See *State v. Robinson*, 303 Kan. 11, 136, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017) (stating that "'staking' jurors is the practice of asking case-specific questions designed to commit prospective jurors to a particular vote or to disclose how they would vote when faced with certain case-specific facts").

20

If Holder wanted to determine whether a juror would be fair and impartial in considering witness credibility he could have, and later did, ask generally whether it would be important to consider the witness' motives and biases in determining the weight given to the testimony. Thus, the district court did not abuse its discretion by refusing to allow Holder to ask the jurors to quantify the credibility of an accomplice witness.

Even assuming the district court's limitation was unreasonable, Holder cannot show prejudice. Holder consistently pointed out Holler's plea deal and her role in the criminal activity in both opening statement and closing argument. On cross-examination, he also challenged Holler's credibility and the deal she made. At the close of trial, the jury was properly instructed that it was their job to determine the weight and credit given to each witness' testimony and that an accomplice witness' testimony should be considered with caution. This court presumes that jury members follow the instructions given. *State v. Gray*, 311 Kan. 164, 172, 459 P.3d 165 (2020). Nothing in the record would lead us to conclude the jurors believed Holler simply because she was the State's witness. Thus, the district court did not abuse its discretion in limiting the scope of the voir dire and, even if it did, the limitation did not prejudice Holder. See *Hudgins*, 301 Kan. at 634.

*Was Holder denied a fair trial based on prosecutorial error in closing argument?*

Holder next claims the prosecutor committed error during closing argument. Our review of a prosecutorial error claim involves a two-step process:  consideration of error and consideration of prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). In considering whether error has occurred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109.

First, Holder argues the State committed prosecutorial error during closing argument by stating that Holder's initial statement to the police was "not true." During closing argument, Holder's counsel told the jury that Holder "was honest with the cops" when he was stopped on the highway. In rebuttal, the prosecutor stated:

"What's he tell the officers? I'm going to Chicago. It was represented to you he was absolutely honest with the officers. What did he say whether he knew the person driving with him? No. I don't know the person in that car. They are just driving along. *It's not true.* It's clear he had been in contact with her. Look at the e-mail messages." (Emphasis added.)

Holder argues the comment was an impermissible statement of the prosecutor's personal belief that Holder was lying. He relies on *State v. Akins*, 298 Kan. 592, 608, 315 P.3d 868 (2014) (finding prosecutor's statement that the defendant's denial was "'not credible'" to be erroneous because the prosecutor did not argue that specific evidence showed the defendant's statements were unworthy of belief). The State argues that the prosecutor's comment was not erroneous because the prosecutor did not assert his personal opinion about Holder's credibility and his comment was in response to Holder's statement during closing that he was truthful to the police.

A prosecutor cannot state his or her personal opinion about the credibility of a witness' testimony. *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015). But, "[a] prosecutor may make statements about a defendant's trustworthiness 'to point out inconsistencies in a defendant's statements and to argue evidence that reflects poorly on a defendant's credibility.'" *State v. Williams*, 308 Kan. 1320, 1325, 429 P.3d 201 (2018).

Here, the prosecutor's comment that Holder's initial statement to the police was "not true" was supported by the evidence. While the specific sentence Holder cites, when read in isolation, would give the impression that the prosecutor stated that Holder was a liar, when taken in context, the prosecutor was merely arguing the evidence showed that

22

Holder's testimony was inaccurate. See *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018) (stating the appellate court examines statements in context rather than in isolation). The prosecutor argued that specific evidence—the messages between Holler and Holder during the drive—showed Holder's statement to officers—that he did not know Holler—were unworthy of belief. The prosecutor's focus on specific evidence that undermined Holder's statement distinguishes the prosecutor's comment here from the prosecutor's comment in *Akins*. In *Akins*, the prosecutor made a broad comment on the defendant's credibility without reference to inconsistencies or specific evidence supporting such an assertion. We find this statement was not erroneous.

Second, Holder argues the State impermissibly appealed to the passions of the jury and diverted the jury's attention from the evidence by stating Holler took responsibility for her actions and stating Holder needed to be held responsible for his actions:

> "There's a whole lot of evidence that he was involved, because what you have to decide is whether the evidence in [the] rest of the case supports what she's telling you. This is not just a simple situation of is she telling the truth? The question is, does the evidence in this case support what she's telling you?
>
>       . . . .
>
> "She made a deal in this case because she was offered one. The question that you have, Ladies and Gentlemen, she's convicted. *She's accepted responsibility.* . . . Did she take the deal? She took the deal. But the question is she's taken responsibility. *Will you hold Dominic Holder responsible for what he did?* Is there evidence in this case to support your verdict of guilty based on all of the facts and circumstances; not just her testimony?" (Emphases added.)

The State argues that the prosecutor was simply responding to arguments Holder made that Holler made a plea deal to avoid prison time. The State argues the fact that Holler made a plea deal was evidence presented at trial and so the prosecutor's comments were permissible based on the evidence.

23

A prosecutor may not inflame the passions or prejudices of the jury when crafting an argument, but the prosecutor may draw reasonable inferences from the evidence. *State v. Anderson*, 308 Kan. 1251, 1261, 427 P.3d 847 (2018). Here, the prosecutor was not trying to inflame the passions of the jury. Instead, he was discussing the evidence. Holder claimed during his closing argument that Holler had a motive to lie because of the plea deal. The prosecutor's response was to imply that Holler taking the plea deal showed that she accepted responsibility for her actions; not that she had a motive to lie. Contrary to Holder's argument, the prosecutor is not diverting the jury's attention by commenting on Holler's acceptance of responsibility. Instead, when read in context, he is bringing the jury's attention back from Holler's actions and motives to focus on Holder's actions.

Kansas courts have held arguments asking the jury to hold the defendant responsible for his actions are proper when they are made without an appeal to the community interest. See, e.g., *State v. Finley*, 273 Kan. 237, 243-45, 42 P.3d 723 (2002) (finding no error in the prosecutor asking the jury not to let the defendant "'get away with this killing'" and to "'hold him responsible'"); *State v. Hill*, 28 Kan. App. 2d 28, 38, 11 P.3d 506 (2000) (finding the prosecutor's statement asking the jury not to let the defendant "'get away with this'" had the same effect as asking the jury to find the defendant guilty). Here, there was no impermissible appeal to the community interest attached to the prosecutor's comment. We find this statement was not erroneous.

In sum, the prosecutor's comments were within the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that did not offend Holder's constitutional right to a fair trial. See *Sherman*, 305 Kan. at 109. We conclude the prosecutor did not commit error in any of the statements challenged by Holder. Because there was no error, we need not engage in the prejudice analysis. See 305 Kan. at 109.

*Did cumulative error deny Holder a fair trial?*

Finally, Holder argues cumulative error violated his right to a fair trial. The test is whether the totality of the circumstances establish that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their relationship, if any; and the overall strength of the evidence. 300 Kan. at 1007.

The court will find no cumulative error when the record supports no errors the defendant raises on appeal. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015). Likewise, a single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). Based on the record here, Holder is entitled to no relief under a cumulative error analysis.

Affirmed.